IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN E. TARPLEY,                                  :

   Plaintiff,                                        :

   v.                                                :          Civil Action No.: GLR-17-3267

HOLLY PIERCE, RNP, et al.,                          :

   Defendants.                                       :

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc. ("Wexford"), Holly Pierce, RNP, William Beeman, RN, Krista Self, RNP, and Mahboob Ashraf, MD's (the individuals, collectively, the "Medical Defendants") Amended Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "Amended Motion") (ECF No. 14). Also pending before the Court is Defendants' Motion to Strike Surreply (ECF No. 35). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant the Amended Motion and deny as moot the Motion to Strike Surreply.

## I.      BACKGROUND[1]

Plaintiff Stephen E. Tarpley is incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. Tarpley has a history of injuries to the

---

[1] Unless otherwise noted, the facts outlined here are set forth in Plaintiff Stephen E. Tarpley's Amended Complaint (ECF No. 12). To the extent the Court discusses facts that Tarpley does not allege in his Amended Complaint, they are uncontroverted and the Court views them in the light most favorable to Tarpley. The Court will address additional facts when discussing applicable law.

L5-S1 disc in his back. (Am. Compl. at 2). In addition, in November of 2000, Tarpley was involved in a motor vehicle accident and sustained a fractured right hip and torn ligaments in his right knee. (Id. at 2–3). On April 10, 2011, after he was incarcerated, Tarpley was involved in a fight with another inmate and suffered "hyperextention [sic] of C3 through C7 vertebrae." (Id. at 3). In January 2012, Tarpley was diagnosed with "degenerative disc disorder" with "marked narrowing of the C3-C7 levels with 'osteophytes'[2] also seen at that level." (Id.).

In January 2012, Dr. Collin Ottey ordered physical therapy and prescribed Baclofen (a muscle relaxer) and ibuprofen to treat the pain and muscle spasms caused by the issues with the vertebrae in his neck. (Id.). Tarpley's course of treatment "continued uninterrupted and largely without improvement through April 2016." (Id.).

In May 2016, Dr. Ashraf[3] saw Tarpley for a chronic care clinic appointment, which is scheduled every 90 days to monitor chronic conditions. (Id.). Tarpley told Dr. Ashraf that he was experiencing neck pain and that the ibuprofen he was taking was not alleviating his pain. (Id. at 4). Tarpley also expressed concern that the ibuprofen might be causing his "stomach to bleed." (Id.). In response to his concerns, Dr. Ashraf prescribed tramadol (Ultram), 50 mg, twice daily in addition to the Baclofen Tarpley was already taking. (Id.). The prescription was set to expire in 120 days. (Id.). At Tarpley's

---

[2] An "osteophyte," also known as a "bone spur," is "an abnormal bony outgrowth or projection." Osteophyte, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/osteophyte (last visited Sept. 26, 2018).

[3] Although mentioned in the Amended Complaint with claims raised against him, Dr. Ashraf was not included in the caption of the Amended Complaint and was never served. For reasons set forth more fully below, Dr. Ashraf, had he been served, would be entitled to judgment in his favor.

next chronic care clinic appointment, Dr. Ashraf renewed the prescriptions to Tarpley's disgruntlement. (Id.). Tarpley states that Dr. Ashraf "had no treatment plan other than to throw pills at it and hope it goes away." (Id.).

In October 2016, Tarpley began having "serious trouble" with his lower back and sought treatment via the sick call procedure. (Id.). Tarpley began "consulting Medical Encyclopedias," which he states instruct that: "Degenerative Disc Disorder [cervical disc] is brought on by 'poor posture' and effects which last more than a few weeks place his condition amongst the extraordinary and suggest that there may be some mechanical interference involved that is causing such serious and protracted discomfort." (Id.). Based on this information, Tarpley asked for a back brace and an extra chair in his cell "so he may sit up straight while confined to his cell for 22 to 23 hours each day." (Id.).

On November 30, 2016, Tarpley states that he saw Dawn Hawk, RN, with whom he discussed his request for another chair. (Id.). Hawk could not locate any prior mention of a chair in his past provider notes and referred Tarpley to the "next level provider." (Id.).

On December 10, 2016, Tarpley complained about not being seen for his back pain. (Id. at 5). In response, a different nurse interviewed Tarpley and was he was again referred to the next level provider. (Id.).

On December 15, 2016, Pierce saw Tarpley but this visit was for a chronic care clinic appointment, and not his back pain. (Id.). Tarpley nevertheless tried to have his back pain addressed. (Id.). Tarpley alleges that Pierce was "dismissive" and "evaded any attempt at addressing [his] request to increase his medication, order an MRI[,] or

[order] a back brace." (Id.). Pierce told Tarpley that all his medications would be renewed. (Id.).

During this appointment, Correctional Officer Michael Stallings was present.[4] (Id.). Tarpley alleges that Pierce violated his right to confidentiality by allowing "her boyfriend, Michael Stallings . . . to sit in on [his] sick call visit." (Id. at 7). Tarpley further alleges that because Stallings was aware of his medical issues, "custody staff were able to use the information" to "torture" him. (Id.). Tarpley asserts that correctional staff took adverse actions against him because Pierce violated the Health Insurance Portability and Accountability Act ("HIPAA") when she allowed Stallings to hear his medical complaints. (Id.).

When Tarpley's newly refilled prescriptions arrived, he noticed that one of the medications Dr. Ashraf prescribed him was changed; all other prescriptions remained the same. (Id. at 5). Tarpley states that Pierce replaced Chlorhexidine Gluconate 0.12% with Chlorhexidine Gluconate 0.2%. (Id.). He states that the former is "anti-bacterial mouthwash" and the latter is a "surgical scrub" that is "highly toxic if used as Ms. Pierce had directed." (Id.). In addition, the solution had a warning on it from the manufacturer warning: "keep out of eyes, ears, and mouth. If swallowed, get medical help immediately, contact poison control center." (Id.).

---

[4] Tarpley claims that Stallings and Pierce are involved romantically and suggests that this relationship somehow made Stallings' presence during his appointment inappropriate. He claims that because Stallings was present during this appointment, he was later subjected to harassment from two other correctional officers. (Am. Compl. at 5–6, 7). No correctional officers are named as defendants in this case.

On an unspecified date, Tarpley filed a sick call request complaining about the "duration of relief" that his current medication, Ultram, was providing him. (<u>Id.</u> at 6). On January 12, 2017, Stacie Mast, RN, saw Tarpley and referred him to a next level provider. (<u>Id.</u>). On January 25, 2017, another nurse, not a next level provider, saw Tarpley. (<u>Id.</u>).

On an unspecified date, Tarpley states he was "finally seen by the next level provider," Pierce. "[I]nstead of addressing [Tarpley's] concerns," Pierce told him she was "discontinuing the current pain medication in favor of 'Capzasin' and Tylenol." (<u>Id.</u>). Pierce also stopped Tarpley's Ultram without weaning him off it. (<u>Id.</u>). As a result, Tarpley experienced "additional pain in the form of cramps, tremors, [and] sweats," which continued over the next three to four days. (<u>Id.</u>). Tarpley "could not sleep[ ] or eat due to the severe cramps." (<u>Id.</u>).

On an unspecified date, Tarpley asked Pierce if she would order an MRI "to discover the cause of this sudden pain." (<u>Id.</u>). Pierce refused and instead ordered an x-ray, stating "we can't do an MRI here." (<u>Id.</u>).

On an unspecified date, Tarpley complained to Dr. Sharon Baucom, Director of Clinical Services. (<u>Id.</u> at 7). Tarpley told Dr. Baucom that "contrary to the claims made by now Defendant Holly Pierce, he was after a remedy and not merely a 'band-aid' of pills." (<u>Id.</u>). Pierce and Dr. Ashraf declined to refer him to a specialist, or provide him a brace or other mechanical support that would eliminate his need for medication. (<u>Id.</u>). As a result, Tarpley was "forced to forgo many of his meals because he could not stand long enough to receive meals at the prison kitchen." (<u>Id.</u>). Tarpley also had to accept an

assignment to a top bunk on February 24, 2017, because his bottom bunk medical order expired on January 7, 2017. (Id. at 9).

On January 31, 2017, Tarpley requested to see a doctor for his "severe and debilitating back pain." (Id. at 8). On February 3, 2017,[5] Breanna Baker, RN, saw Tarpley. (Id.). Baker informed him that he would need to "await the results of the x-ray report" before seeing the doctor. (Id. at 8–9).

On an unspecified date, Tarpley received his x-ray report. (See id. at 9). The x-ray report indicated that Tarpley has "mild to moderate degenerative changes at L5-S1 disc level" and that there was "no [acute] fracture, dislocation, or subluxation." (Id.). The report also indicated that "vertebral body heights were preserved" and "lumbar lordosis is normal." (Id.).

On March 17, 2017, Tarpley submitted another sick call slip seeking treatment and medication for his neck, shoulder, lower back, right hip, and right leg pain. (Id.). In response, on March 21, 2017, Buser saw Tarpley. (Id.). She noted "pain [and] tenderness in back upon examination, pain with movement, tingling in feet, numbness." (Id.). Tarpley states that Buser also noted that he had been seen by the provider the week before, he was taking Baclofen and Tylenol, there were no changes in symptoms, and the provider wanted Tarpley to stay on the two medications he was already receiving for now. (Id.).

---

[5] Tarpley writes the date February 3, 2013 in the Amended Complaint. Given the context, but the Court assumes that he means 2017.

On April 1, 2017, Tarpley submitted another sick call slip seeking relief from "serious lower back pain." (Id.). On May 24, 2017, Tarpley "frustrated from not having anything [ ] done to abate his lower back trouble," contacted Beeman, Director of Nursing. (Id.). Tarpley told Beeman he wanted his bottom bunk order renewed and that Pierce had neglected to renew it in December 2016. (Id.). He also requested consideration of a back brace to treat his back pain because Dr. Ashraf had told him it was up to Beeman to decide if Tarpley would receive one. (Id. at 9–10). On an unspecified date, "shortly thereafter," Beeman saw Tarpley and renewed his Ultram prescription. (Id. at 10).

On June 26, 2017, Tarpley states that he was called to the treatment room in Unit 3 where Pierce was waiting with Stallings. (Id.). When Tarpley asked why he had been called to the room, Pierce claimed Tarpley submitted a sick call slip, which Tarpley denies. (Id.). Pierce then told Tarpley she was discontinuing his Ultram and replacing it with Cymbalta. (Id.). Pierce explained that "headquarters" authorized her to make medication substitutions for Ultram "due to the large number of overdoses." (Id.).

Tarpley took the Cymbalta as prescribed from June 27 to June 29, 2017. (Id.). He "noticed an immediate and drastic increase in his heart rate, sweats, headache, ringing in his ears, and blurred vision." (Id.). His cellmate had to assist him in getting out of his bed because he "could not focus and his knees were wobbly." (Id.). Tarpley "realized the symptoms were caused by a drastic increase in his blood pressure" and in an attempt to control the symptoms he "took one and then another Losatran." (Id.). When Tarpley reported the side effects he was experiencing to Pierce, she told him to "keep taking [the]

Cymbalta" and that in one week she would be increasing the dosage. (Id.). Pierce "declined to even check [his] blood pressure." (Id. at 10). Tarpley maintains that Cymbalta is not a suitable drug to prescribe to someone who, like he, suffers from hypertension. (Id. at 11). Tarpley claims that during the time he was prescribed Cymbalta, he "could not stand up straight, had to crawl from his bed to the door to get his meal tray, and was not able to go to the shower or out for recreation." (Id.). Tarpley continued his efforts to have the Cymbalta prescription changed to no avail. (Id.). On August 18, 2017, an unspecified change in the order for Tarpley's medication, written by Self in July, was implemented. (Id.).

Tarpley was prescribed physical therapy, but he was unable to attend because he was required to wait for his appointment in a "standing room only" holding cell. (Id.). He explains that the only time he suffers lower back pain is when he is standing. (Id.).

Tarpley states that after one year of trying to obtain pain medication he is being prescribed ibuprofen, 800 mg, but the medication "cause[s] his stomach to bleed" and "cannot be ingested in the quantity, or with the frequency that is necessary" to alleviate his pain. (Id. at 12). Self, Ashraf, Pierce, and Beeman insist that Ultram and Baclofen "are not recommended for long term use," but none of them have "submitted a request for an MRI" or suggested any form of "comprehensive treatment" to address the problem. (Id.).

On September 7, 2017, Tarpley, proceeding pro se, sued Wexford, Pierce, and Beeman in the Circuit Court for Allegheny County, Maryland. (ECF No. 2). On

November 3, 2017, Wexford, Pierce, and Beeman removed the case to this Court. (ECF No. 1).

On December 20, 2017, Wexford, Pierce, and Beeman filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 11). In response, Tarpley filed an Amended Complaint on January 5, 2018, adding Defendants Self and Ashraf.[6] (ECF No. 12). In his Amended Complaint, Tarpley alleges violations of his Eighth Amendment rights for deliberate indifference to his medical needs and brings medical malpractice claims. (Am. Compl. at 13–15). Specifically, Tarpley asserts that:

1. Wexford, Ashraf, and Pierce committed medical malpractice by "failing to exercise due diligence and reasonable care to diagnose and treat" his "cervical disc disorder and lower back pain." (Id. at 13).

2. Wexford and Pierce "failed to exercise reasonable care" in diagnosing and treating Tarpley's "neck and back pain." (Id.).

3. Wexford and Ashraf exhibited deliberate indifference to Tarpley's neck and back pain by failing to request an "appropriate examination" for purposes of diagnosing Tarpley's condition, given the symptoms reported. (Id.).

_____

[6] Tarpley's Amended Complaint supersedes his original complaint. See Young v. City of Mt. Ranier, 238 F.3d 567, 572 (4th Cir. 2001) (noting that the general rule is "an amended pleading ordinarily supersedes the original and renders it of no legal effect" (quoting Crysen/Montenay Energy Co. v. Shell Oil Co., 226 F.3d 160, 162 (2d Cir. 2000)).

4. Wexford and Pierce "engaged in experimentation" by "administering compounds and substances not recognized by the medical community as appropriate" for symptoms of neck and back pain; by persisting in administering Cymbalta; refusing Tarpley's requests for examination after reporting side effects; and by abruptly discontinuing his Ultram prescription, causing withdrawal symptoms. (<u>Id.</u> at 13–14).

5. Wexford and Beeman obstructed Tarpley's requests for treatment in violation of his Eighth Amendment rights and contrary to Department of Public Safety and Correctional Services ("DPSCS") policy. (<u>Id.</u> at 14).

6. Pierce knowingly disclosed sensitive and private medical information to "unauthorized and nefarious actors." (<u>Id.</u> at 14).

7. Wexford and Self refused to treat his chronic back pain "in a manner consistent with professionally accepted norms." (<u>Id.</u> at 15).

8. Wexford, Pierce, Ashraf, and Self failed to "formulate a treatment plan reasonabl[y] calculated to relieve, abate and/or repair" Tarpley's neck and lower back injuries "consistent with accepted professional norms." (<u>Id.</u> at 15).

Tarpley seeks compensatory and punitive damages and injunctive relief. (<u>Id.</u> at 16–19).

On January 17, 2018, Defendants filed an Amended Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.[7] (ECF No. 14). Tarpley filed an Opposition on August 21, 2018. (ECF No. 31). On August 27, 2018, Defendants filed a Reply. (ECF No. 32). On September 7, 2018, Tarpley filed a Response to Issues Raised by Defendants in Their Response to Plaintiff's Opposition. (ECF No. 34). Defendants filed a Motion to Strike Surreply on September 11, 2018. (ECF No. 35).

## II.    DISCUSSION

### A.    Defendants' Motion to Strike Surreply

Tarpley's filing titled "Response to Issues Raised by Defendants in Their Response to Plaintiff's Opposition" addresses Defendants' Reply. Accordingly, the Court construes it as a surreply.

Federal Rule of Civil Procedure 12(f) provides that courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Here, instead, Defendants seek to strike Tarpley's entire Response to Issues Raised by Defendants in Their Response to Plaintiff's Opposition as improper. Accordingly, the Court construes the Motion as an Opposition to Tarpley's filing.

"Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed." Local Rule 105.2(a) (D.Md. 2016). Typically, "[s]urreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605

---

[7] Defendants incorporate by reference their first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment into their Amended Motion. (Defs.' Am. Mot. Dismiss Summ. J. ["Defs.' Mot."] ¶ 5, ECF No. 14).

(D.Md. 2003) (citing <u>Lewis v. Rumsfeld</u>, 154 F.Supp.2d 56, 61 (D.D.C. 2001)).  Here, Tarpley does not address issues raised for the first time in Defendants' Reply.  Rather, he takes issue with Defendants' argument that he failed to follow state law procedures for bringing his medical malpractice claims and disputes Defendants' characterization of the record.  Consequently, the Court does not consider Tarpley's unauthorized surreply and will deny Defendants' Motion to Strike as moot.[8]

## B.     <u>Conversion of Defendants' Motion</u>

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56.  A motion styled in this manner implicates the Court's discretion under Rule 12(d).  <u>See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012).  This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56."  Fed.R.Civ.P. 12(d).  The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'"  <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C

---

[8] Tarpley also raises new claims that Stacie Mast refused to conduct a physical, Regina Lease, RN, refused his sick call request, and Self twice refused to see him for chronic care appointments.  A plaintiff is, however, "bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint."  <u>Zachair, Ltd. v. Driggs</u>, 965 F.Supp. 741, 748 n.4 (D.Md. 1997), <u>aff'd</u>, 141 F.3d 1162 (4th Cir. 1998).  The Court, therefore, does not consider these allegations.  Tarpley may bring a separate lawsuit related to these allegations if he so chooses.

Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition."

Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, Tarpley did not file a Rule 56(d) affidavit. In addition, although discovery has not formally commenced through the issuance of a scheduling order, see Local Rule 104.4 (D.Md. 2016), Tarpley received copies of his entire medical record on July 12, 2018. (Line, ECF No. 26). Tarpley also states that he "has received the documentation necessary to support his opposition." (Mot. Ext. Time at 1, ECF No. 29). Accordingly, because both requirements for conversion are satisfied, the Court will construe Defendants' Motion as a motion for summary judgment.

## C.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers,

or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to

make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**D.    Analysis**

**1.    Eighth Amendment Claims**

To the extent that Tarpley's claims of "deliberate indifference" imply a constitutional claim, they are analyzed under the Eighth Amendment. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Estelle, 429 U.S. at 102. In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . ." Grayson v. Peed, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian,

503 U.S. 1, 9 (1992) (noting that there is no expectation that prisoners will be provided with unqualified access to health care).  A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008), see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (holding that the failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need), cert. denied sub nom. Phillip v. Scinto, 138 S.Ct. 447 (2017).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  See Farmer, 511 U.S. at 839, 40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). As the United States Court of Appeals for the Fourth Circuit has explained, "[t]he requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" King v. Rubenstein, 825 F.3d 206, 219 (4th Cir. 2016) (citing Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003)).  Although this "entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. (quoting Farmer, 511 U.S. at 835).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844.

Further, while "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." De'lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013). But "disagreements between an inmate and a physician over the inmate's proper medical care" do not rise to the level of a constitutional violation "absent exceptional circumstances." Scinto, 841 F.3d at 225–26 (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)).

Defendants advance two main arguments that the Court should grant summary judgment in their favor: (1) there is no genuine dispute of material fact that the Medical Defendants were not deliberately indifferent to Tarpley's medical needs; and (2) Tarpley fails to allege that Wexford maintained a custom, policy, or practice that violated Tarpley's constitutional rights.[9] The Court agrees and addresses the arguments in turn.

### a. Medical Defendants

Tarpley alleges that Pierce violated his Eighth Amendment rights by: "engag[ing] in experimentation by "administering substances and compounds not recognized by the medical community as appropriate"; discontinuing prescriptions for Ultram and Baclofen; changing the strength for a prescription mouthwash; prescribing Cymbalta, which is contraindicated by his hypertension; refusing to order an MRI or refer him to a specialist; allowing the order assigning him to a bottom bunk to expire; and failing to

---

[9] Defendants also argue that Tarpley does not allege sufficient facts to support a claim for punitive damages and that Tarpley is not entitled to injunctive relief. Because the Court will grant judgment in Defendants' favor on alternative grounds, the Court does not address these arguments.

wean him off of Ultram, causing withdrawal symptoms. Tarpley also alleges that Beeman obstructed his requests for treatment—specifically for an MRI and back brace, and to resume his Ultram and Baclofen prescriptions. As to Dr. Ashraf, Tarpley pleads that he failed to refer him to a specialist. With respect to all of the Medical Defendants, Tarpley complains that they say that Ultram cannot be used for long-term treatment of chronic pain, yet he was previously treated with the medication for a period of years.

Defendants contend that the Medical Defendants' actions, as described by Tarpley, simply do not evidence a subjective intent to deliberately deprive him of needed care. The Court agrees.

Here, as Tarpley's Opposition demonstrates, his claims are based on his disagreement with the Medical Defendants' medical opinion and Tarpley' view that his degenerative disc disease should be addressed in a different manner. Tarpley's assertions that the practice of prescribing medication to address symptoms is not appropriate treatment for his condition fail to include any evidence that his objective symptoms warranted additional intervention. In addition, declining requests for tests, medical devices, or specific medications for which the prisoner-patient expresses a preference, absent a medical need for it, does not constitute deliberate indifference. See Scinto, 841 F.3d at 225–26. And Tarpley does not put forth any evidence that demonstrates a medical need for a particular medication. Further, to the extent a medication causes side effects, Tarpley was free to decline the medication and apparently did so here. (Defs.' Mot. Ex. 1 at 87, ECF No. 11-3). Tarpley's opinion that the Cymbalta prescription

constitutes "experimentation" because it is not approved to treat his condition is also meritless. Cymbalta is an FDA-approved drug for chronic musculoskeletal pain.[10]

Tarpley's medical records establish an ongoing course of medical care evidencing a concerted effort to attempt to adequately address his concerns about his back and neck pain. His dissatisfaction with changes in medication that occurred after he complained about inadequate pain relief was not, as he would have it, deliberate indifference to his need for medical intervention. Tarpley's complaints of neck and back pain include radiating pain down both of his legs, "and less frequently radiating into his shoulder and arms." (Joubert Aff. ¶ 5, ECF No. 11-5). "On the majority of occasions when [Tarpley] has been seen by medical [he] either stated he had no active pain or was observed to be acting in a manner inconsistent with a patient experiencing significant pain." (Id.) In light of his admission that he "can perform his activities of daily living and can perform community errands" Tarpley was provided information on "range of motion exercises and . . . on how to perform them as a means of reducing his neck and back pain." (Id.).

Tarpley has also been prescribed physical therapy "as physical activity and exercise are good means to delay the onset of intermittent back pain and reduce its intensity." (Id.). But Tarpley is noncompliant with the plan. (Id.; see also Defs.' Mot. Ex. 1 at 81, 93–94, 98). He "categorically states that exercise does not help and has refused to attend physical therapy." (Joubert Aff. ¶ 5). Tarpley, for his part, asserts that he does not attend physical therapy because the waiting room is "standing room only,"

---

[10] See Highlights of Prescribing Information 1 (2017), https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021427s049lbl.pdf (stating that Cymbalta is indicated for "Chronic Musculoskeletal Pain").

and he suffers from lower back pain while standing. (Am. Compl. at 11). Tarpley's assertion does not, however, rebut the evidence in the record that the Medical Defendants repeatedly attempted to address his back and neck pain, including through means other than medication. Thus, it is clear that Tarpley is not in pain because of a lack of medical attention, but because he is disinterested in cooperating with the plan of care medical staff have formulated to address his pain. In short, Tarpley's disagreements with his medical care providers, without more, do not constitute deliberate indifference. See Scinto, 841 F.3d at 225–26.

With regard to Tarpley's Ultram prescription, he reported to medical staff that it was ineffective to address the pain radiating to his legs, therefore it was discontinued. (Joubert Aff. ¶ 7). In addition, Ultram is "habit-forming with long-term use as the drug can induce addiction, abuse, and misuse . . . [which] can lead to overdose and death." (Id. ¶ 8). The change in his prescriptions was, therefore, not the result of deliberate indifference to his suffering, but born out of concern for his overall health and the potential for misuse and abuse.

Finally, to the extent Tarpley alleges that Pierce changed the dosage on his prescription mouthwash and permitted his bottom bunk order to expire, these allegations, at best, may amount to medical negligence. In other words, these allegations do not rise to the level of cognizable constitutional violations. See Grayson v. Peed, 195 F.3d at 695–96.

In sum, the Court concludes that the Medical Defendants are entitled to summary judgment in their favor on the Eighth Amendment claims asserted against them because

Tarpley has not rebutted the overwhelming evidence establishing that the care he has received is appropriate but is simply not what he prefers. Accordingly, the Court will grant Defendants' Motion as to the Eighth Amendment claims against the Medical Defendants.

### b. Wexford

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727–28 (4th Cir. 1999); Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982); Clark v. Md. Dep't of Pub. Safety and Corr. Servs., 316 F.App'x 279, 282 (4th Cir. 2009). Instead, a private corporation performing a government function may be held liable under § 1983 only if it "subscribes to a custom, policy, or practice" that violated citizen's constitutional rights. See Owens v. Balt. City State's Atty's Office, 767 F.3d 379, 402 (4th Cir. 2014).

Here, Tarpley's claims against Wexford do not reference a corporate policy, custom, or practice as the cause of his alleged injuries. Rather, his claims against Wexford are predicated solely on its status as the employer for the Medical Defendants. Thus, the Court concludes that Hower's claims against Wexford fail as a matter of law.[11]

---

[11] To the extent Tarpley brings claims against Wexford and Beeman for violating DPSCS policy, these claims also fail. See Weatherholt v. Bradley, 316 F.App'x 300, 303

Accordingly, the Court will grant Defendants' Motion as to the Eighth Amendment claims against Wexford.

### 2. Medical Malpractice Claims

Tarpley also brings state law medical malpractice claims against Defendants. District courts may decline to exercise supplemental jurisdiction over a state claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3) (2018). Because the Court will dismiss Tarpley's § 1983 claims, the sole claims over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction Tarpley's state law claim. The Court will, therefore, dismiss Tarpley's state law claims without prejudice. He may re-file them in state court if he so chooses.

### 3. HIPAA Violation

Tarpley claims that Pierce violated the privacy provisions of HIPAA when she disclosed information concerning his medical condition in the presence of a correctional officer. HIPAA prohibits the wrongful disclosure of unique health identifiers or individually identifiable health information. 42 U.S.C. §1320d-6 (2018). "It is well established, however, that no private right of action exists under HIPAA." Atkinson-Bush v. Balt. Wash. Med. Ctr., Inc., No. L-10-2350, 2011 WL 2216669, at *3 (D.Md. May 25, 2011), aff'd, 585 F.App'x 161 (4th Cir. 2014). Further, "neither the U.S. Supreme Court nor the Fourth Circuit has ever recognized a constitutional right in the

---

(4th Cir. 2009) (per curiam) (quoting Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996)) (noting that a failure of prison officials to follow their own internal policies, procedures, or regulations does not, by itself, amount to a constitutional violation).

privacy of prisoners' medical records." Van Higgins v. Miller, 2012 WL 4511524 at *2 (W.D.N.C. Oct. 1, 2012). Tarpley, therefore, has no viable legal claim against Pierce for permitting a corrections officer to be present during his medical appointments. As a result, the Court Tarpley's claim against Pierce for the disclosure of his health information fails as a matter of law.[12]

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Amended Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 14) and deny as moot their Motion to Strike Surreply (ECF No. 35). A separate order follows.

Entered this 26th day of September, 2018

_____/s/_____
George L. Russell, III
United States District Judge

---

[12] To the extent that Tarpley alleges that corrections officers took adverse actions against him on the basis of the medical information disclosed, the correctional officers who allegedly took such actions are not named as Defendants in this case. Accordingly, any claim against those corrections officers that Tarpley may wish to assert is dismissed without prejudice.